JUDD v. TOWNSHIP OF CALEDONIA.

1. HIGHWAYS AND STREETS—DEFECTIVE HIGHWAYS—PERSONAL IN-
   JURIES—CONTRIBUTORY NEGLIGENCE — UNMANAGEABLE HORSE—
   DIVERTED ATTENTION.
   Where a township without erecting any barriers removed the
   planking from a highway culvert at a point where its condi-
   tion could not be discovered by travelers until within three
   rods from the culvert, and at the same time left close to the
   roadway bags of cement covered with canvas, which were
   well calculated to frighten gentle horses and did frighten
   plaintiff's horse so that in urging him past the cement he mo-
   mentarily got beyond control, resulting in an accident at the
   culvert, the question of plaintiff's contributory negligence in
   attempting to drive his horse past the bags of cement was a
   question for the jury.

2. SAME—PROXIMATE CAUSE OF INJURY—FRIGHTENED HORSE.
   The horse's fright was not the proximate cause of the injury
   though he was momentarily beyond control, so far as stop-
   ping him was concerned.

3. EVIDENCE — EXPERT EVIDENCE — PHYSICIAN CALLED TO MAKE
   TESTIMONY.
   Testimony from a physician called to consult with the attend-
   ing physician with respect to the treatment of the case is not
   inadmissible under the rule of O'Dea v. Railroad Co., 142
   Mich. 265, excluding statements made to witnesses called to
   make testimony.

4. SAME—NATURE OF INJURIES—OPINIONS.
   Error in permitting plaintiff's medical witness to state on re-
   direct that in his opinion plaintiff was not malingering is
   harmless where defendant in his cross-examination of the
   same witness brought out substantially the same statement.

Error to Shiawassee; Miner, J. Submitted October 9,
1907. (Docket No. 8.) Decided December 30, 1907.

Case by Edward Judd against the township of Cale-
donia for personal injuries. There was judgment for
plaintiff, and defendant brings error. Affirmed.

*John T. McCurdy*, for appellant.

*A. L. Chandler*, for appellee.

BLAIR, J.   Plaintiff brought this action to recover damages for injuries claimed to have been suffered by him in consequence of the negligence of the defendant in removing the planking of a culvert under the highway, in consequence of which plaintiff's buggy in which he was riding was overturned.   The planking was removed after noon of the 7th day of September, 1905.   No barriers or warning signs were erected to prevent people using the road across the culvert, and the negligence of the defendant seems to be conceded.·

At the time of the accident, plaintiff was driving a gentle horse, and his wife and niece were riding with him. Three rods from the culvert crossing, an east and west highway crosses the north and south highway upon which plaintiff was traveling.   About at this point, plaintiff's horse became excited and frightened at some bags of cement covered over with white canvas, which were well calculated to frighten horses, and had been placed near the bridge by the highway commissioner.   Plaintiff, having theretofore driven his horse past piles of cement, and, thinking that he could do so in the present instance, spoke to her and urged her forward.   When about two rods from the opening of the culvert, the horse suddenly leaped forward.

" I continued urging the horse forward and when about two rods from the pile she commenced going faster, then broke into a run.   I lost control of her so far as stopping her was concerned."

Carrie Failing, plaintiff's niece, who was riding with him, testified:

"When I was going north sitting in the buggy, I looked up the road ahead of me beyond the cement; I saw nothing but the hole there.   That is all I see.

" *Q.*  When was it you saw the hole ?

"*A*. Not until we got right up to it.

"*Q*. I am asking before you got up to it.   While you were driving along from the corners up to the hole, what was there before you that you could see to hinder you from going north in any way.

"*A*. Not anything.   *   *   *

"*Q*. How near were you to the bridge when you saw the bridge was out, as near as you could tell?

"*A*. I couldn't tell; we was right up close to it.   *   *   * You couldn't see it until you got right up to it.

"*Q*. Did you look?   Isn't it a matter of fact that you were all looking at the cement pile?

"*A*. Yes, sir, I looked at that.

"*Q*. Did you see that big temporary bridge that was right there to the east of the ditch?

"*A*. No, sir.

"*Q*. You didn't look at that, did you?

"*A*. No, sir, I didn't notice it.

"*Q*. Did you see the signboard that said upon it, 'Bridge out?'

"*A*. No, sir.   There was none there.   If there was such a sign I should have thought I would have seen it if it had been there.   I didn't see it."

She also testified to seeing or to noticing some dirt extending across a portion of the highway where the bridge had been taken up, a foot or a foot and a half high.

"*Q*. That was across the highway as you remember it?

"*A*. Yes, sir; I could see there wasn't some of the broken planks and debris out of the old bridge thrown up on that pile of dirt.   I know there was none there.   I am positive about that.

"*Q*. Describe to the jury what you mean by that little dirt or grade just before you come to the bridge.

"*A*. Why, it was a little up like that, before you come to the bridge, is the reason that you couldn't see the bridge until you come right up to it."

Other witnesses testified the pile of dirt was eight or ten inches high.   This pile of dirt was rather to the east of the wrought portion of the north and south road as one came up from the south and drove up to the bridge. Defendant's witness, Stuart, testified as follows:

"*Q.* At what point tell the jury where it was possible for you to see looking forward to the north and in the highway the excavation or opening that had been caused by taking off the stringers from the old culvert.

"*A.* I could three rods south. I couldn't look down into the culvert but I could see the farther edge. I could see down perhaps a foot into the culvert on the north bank. I was sitting on the load of gravel. It was plainly and distinctly discernible to me. I didn't say that I could readily discern the opening farther than three rods south but I could see that there were obstructions in the road."

The trial court submitted the case to the jury, who rendered a verdict in favor of the plaintiff for $500, and defendant brings the record to this court for review upon writ of error. The errors upon which defendant relies for a reversal are:

*First.* Plaintiff was guilty of contributory negligence as a matter of law.

*Second.* Testimony of physicians was allowed, who were called with the intention of using them as witnesses.

*Third.* The court permitted a medical witness to answer the following question against defendant's objection:

"*Q.* There has been much said about malingering. In these examinations that you made of Mr. Judd, in any one of them, did you see anything from his conduct that led you to believe that he was malingering in any way?

"*Mr. McCurdy:* I object to that as incompetent, irrelevant, immaterial and inadmissible.

"*The Court:* He may answer. Defendant excepted.

"*A.* No, I saw nothing to lead me to think he was malingering."

*First.* We do not think that it can be said that the evidence conclusively showed that plaintiff was guilty of contributory negligence, although the case is a very close one. The defendant was responsible for the situation presented to the plaintiff, bags of cement and all. The evidence tended to show that these bags of cement, covered over with white canvas as they were, were likely to frighten gentle horses, and defendant is, therefore, chargeable with placing the bags of cement near the bridge or

culvert with knowledge that any horse being driven towards the culvert would probably be frightened thereby. It follows, as a matter of course, that if the horse became frightened at the cement, it would become necessary for the driver to devote his attention largely to the management of the animal and thereby to distract his attention from the condition of the roadway. The evidence tended to show that the opening in the highway, either by reason of the grading up of the dirt or for some other unexplained reason, was not visible to the occupants of the buggy until they were within three rods of the opening. The placing of the cement in the highway and the removing of the planking were concurrent causes of the injury, and it was for the jury to say whether, in view of all the circumstances, it was negligent for plaintiff to attempt to drive the horse past the cement; whether, in view of the conduct of the horse diverting the attention of the driver and occupants of the carriage from the road, they were negligent in not discovering the absence of the planking, and whether the horse had entirely escaped from plaintiff's control or only momentarily. It cannot be held, as a matter of law, that plaintiff was guilty of negligence because he attempted to drive the horse past an object of which she was evidently afraid, nor that the horse's fright was the proximate cause of the injury because she was momentarily beyond plaintiff's control, so far as stopping her was concerned. *Herring* v. *City of St. Joseph*, 137 Mich. 480; *Langworthy* v. *Township of Green*, 95 Mich. 93; *Gage* v. *Railroad Co.*, 105 Mich. 335; *Harris* v. *Township of Clinton*, 64 Mich. 447.

*Second.* We do not think the evidence in this case renders the medical testimony complained of incompetent under the rule of *O'Dea* v. *Railroad Co.*, 142 Mich. 268. The testimony complained of indicates that the physician, Dr. Hume, was called to consult with the attending physician, Dr. Bailey, with regard to the treatment to be pursued in the case.

*Third.* Did the trial judge err in permitting the wit-

ness to answer the question, under the rule laid down in *McCormick* v. *Railway Co.*, 141 Mich. 17? Plaintiff argues that practically the same question was asked by defendant's counsel, who thereby opened the door for the admission of such testimony, and even if the testimony was erroneously admitted, it must have been error without prejudice. The questions and answers largely relied upon by plaintiff's counsel as excusing the error are the following, in the cross-examination of Dr. Bailey:

"Then, Doctor, take a man with the education Mr. Judd had. One who is a reader, who says himself he has read doctors' books upon the subject of spinal cord, its uses, its purposes, describe the gray and white matter, the functions of the cord, and also says he has talked with his doctors concerning that cord, would it not be easier for a man of that caliber and mentality to feign symptoms arising from the spinal cord than a man who is perfectly honest in regard to the matter and didn't know anything about the cord or its uses?

"*A.* Yes, it would be easier for such a man.

"*Q.* So if a man wants to appear to be hurt he has got it in his power to make up a pretty good case by malingering, hasn't he?

"*A.* Yes. Malingering means putting on, also pretending.

"*Q.* Making believe so. Instead of using the word malingering, I will say making believe here, and is in a position to make believe he has received an injury to the spinal cord if he so desires, that is true, isn't it?

"*A.* Yes. * * * I have made no examination of his urine, which is one of the best tests to determine whether or not the spinal cord is affected.

"*Q.* If a man was malingering and you should examine his urine and you should find an entire absence of anything that would indicate an injury to that spinal cord, that would lead you to believe that the man was deceiving you? You would think he was malingering?

"*A.* Yes. But I didn't think it was necessary to examine it in Mr. Judd's case. I was positive there was some injury there. I might be deceived."

In view of the cross-examination upon the subject of malingering and the witness' answer, "I was positive

there was some injury there," we do not think that permitting the answer complained of should be held to be prejudicial error.

Judgment affirmed.

MCALVAY, C. J., and CARPENTER, GRANT, and MONTGOMERY, JJ., concurred.